IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:20-cv-502

| | | |
|---|---|---|
| BONITA WESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| WELL CARE HOME HEALTH OF THE | ) | **(JURY TRIAL DEMANDED)** |
| TRIANGLE, INC. & WELL CARE | ) | |
| HOME HEALTH, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## OVERVIEW OF ALLEGATIONS AND CLAIMS

1. This case arises out of Defendants' unlawful practice of discriminating against Plaintiff by terminating her because of her pregnancy-related disability, and related refusal to grant her a reasonable accommodation in violation of 42 U.S.C. § 12112(a), *as amended*, as well violations of Title VII (sex discrimination) due to Plaintiff's pregnancy.

2. Plaintiff Bonita Wester (Ms. Wester) states her causes of action against Defendants Well Care Home Health, Inc. and Well Care Home Health of the Triangle (collectively, "Defendants" or "Well Care") as follows.

## PARTIES

3. Plaintiff Bonita Wester ("Ms. Wester") was an "employee" of Defendants from July 2018 to January 2019.

4. Defendant Well Care Home Health of the Triangle, Inc. is a North Carolina business corporation with an office located in Wake County, North Carolina and a listed principal office location in New Hanover County, North Carolina.

5. Defendant Well Care Home Health, Inc. is a North Carolina business corporation with a

1

principal office location in New Hanover County, North Carolina.

6.    Defendants each employ 15 or more employees and are "employers" covered by Title VII and the Americans with Disabilities Act ("ADA").

## JURISDICTION & VENUE

7.    Plaintiff's claims of discrimination arise under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (ADA) and under Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e *et. seq*, as amended by the Pregnancy Discrimination Act of 1978 ("PDA")

8.    This Court has jurisdiction over this action under 28 U.S.C. § 1331.

9.    This Court has jurisdiction over Plaintiff's claims because Plaintiff filed a timely Charge of Discrimination with the proper administrative agency against both named Defendants and received a Right-to-Sue letter mailed March 12, 2020, and received thereafter on March 17, 2020.

10.   Venue is proper in the United States District Court for the Middle District of North Carolina under 42 U.S.C. § 2000e–5(f)(3) because the alleged employment discrimination occurred in the state of North Carolina and Plaintiff would have worked in the Middle District but for the unlawful employment practices alleged in this complaint. Specifically, as a member of the "Piedmont Team," Plaintiff was required to supervise the treatment of patients that resided within Durham County, among others.

## ADMINISTRATIVE PROCEEDINGS

11.   On March 7, 2019, Ms. Wester filed a timely charge of discrimination against Defendants with the EEOC. (Exhibit A)

12.   On January 23, 2020, the EEOC determined that Well Care violated the ADA and Title VII. (Exhibit B)

13. On or about March 12, 2020, the EEOC mailed a notice of right to sue pursuant to the ADA and Title VII to Ms. Wester, and she received it thereafter on March 17, 2020. (Exhibit C)

14. This action has been filed with this Court within 90 days of Ms. Wester's receipt of the right-to-sue notice of from the EEOC. Ms. Wester has fully complied with all administrative prerequisites before filing this action.

## FACTUAL ALLEGATIONS

### Defendants Operate as an Integrated Enterprise and are Joint Employers

15. Plaintiff Bonita Wester ("Ms. Wester") began working for Defendants on or about July 30, 2018 as a Clinical Care Coordinator.

16. Plaintiff's employment was officially terminated on January 3, 2019.

17. At all relevant times, Defendants functioned as an integrated enterprise and/or as Joint Employers of Plaintiff.

18. "Well Care Health" describes itself as an "integrated, post-acute care company providing home health and personal care services throughout North Carolina." It encompasses the entities Defendant Well Care Home Health, Inc., and several other entities which service different regions in North Carolina, including Defendant Well Care Home Health of the Triangle, Inc., which serves Wake, Durham, and surrounding counties.

19. Well Care Health markets the total size and geographic extent of its operations,.

20. For example, the website wellcarehealth.com claims that "[t]he agency serves more than 40 counties in North Carolina, from the coast to the Triad, and employs more than 800 people."

3

21.    The website also identifies office locations throughout the state, including offices located in Wake, Guilford, Davie, and Mecklenburg counties.

22.    Upon information and belief, Defendant Well Care Home Health, Inc. is the entity which employs Well Care's executive management, including the head of Human Resources (aka Chief People Officer) and the head of operations (i.e. Chief Operations Officer).

23.    The officers and employees of Defendant Well Care Home Health exert control over Defendant Well Care Home Health of the Triangle.

24.    The officers and employees of Defendant Well Care Home Health had the authority to affect the terms and conditions of Ms. Wester's employment, including recommendations and procedures for employee supervision and discipline.

25.    Upon information and belief, organization-wide policies are formulated and approved by employees and officers who work for Defendant Well Care Home Health, and these policies govern and influence the decisions made by Defendant Well Care Home Health of the Triangle, including personnel decisions, benefits offered, and compensation levels.

26.    Upon information and belief, Defendant Well Care Home Health was the entity responsible for hiring and providing training to Plaintiff.

27.    On July 26th, 2018, Plaintiff received an offer of employment letter from Defendant Well Care Home Health, Inc. and on July 30, 2018, Plaintiff signed an employment agreement simply with "Well Care."

28.    Upon information and belief, personnel decisions, including the hiring and firing of employees and the decision on whether to provide an employee with an accommodation under the ADA are approved, considered, and/or co-determined by employees and

4

officers who work for Defendant Well Care Home Health, Inc. and Defendant Well Care Home Health of the Triangle.

29.    Plaintiff worked in a building with the following address: "<u>Well Care Home Health</u>, 8025 Creedmoor Rd., Suite 200, Raleigh, NC."

30.    On January 3, 2019, Plaintiff received a termination letter from the HR Coordinator of Well Care, LLC stating that her employment with "Well Care Home Health of the Triangle has ended as of 01/03/19."

31.    Under the joint-employment doctrine, Defendants Well Care Home Health, Inc. and Well Care Home Health of the Triangle ("Well Care") were Ms. Wester's "employer" for Title VII purposes.

### Ms. Wester's Employment at Well Care

32.    Well Care employs nurses, nurses' assistants, and physical therapists among other roles and these professionals travel to the homes of patients to provide care.

33.    A significant amount of administrative and managerial work is necessary to run this type of business, and while some of this administrative work can be done by non-medical professionals, some of it is done by licensed and credentialed professionals, such as Registered Nurses (RN).

34.    Bonita Wester ("Plaintiff" or "Ms. Wester") is a registered nurse that began working for Well Care on or about July 28, 2018 as a Clinical Care Coordinator. Her official termination date was January 3, 2019.

35.    Ms. Wester's immediate supervisor was named Amelia Platte ("Ms. Platte").

36.    Plaintiff's onboarding documents reflected that her assigned team was "Piedmont/Sandhills," and after she was hired, she participated in a multi-week

5

orientation process which included in-office meetings and field visits within her team's service area, which included Durham and surrounding counties.

37. As a member of the Piedmont/Sandhills team, Plaintiff supervised employees and managed patient care throughout the Piedmont region, including treatment for patients that lived in Durham County.

38. In addition to overseeing an interdisciplinary team of practitioners that traveled to the homes of Well Care patients, Ms. Wester's job duties included ensuring that there was proper and correct documentation associated with the treatment of patients, and ensuring that certain data was correctly entered in the "OASIS" system.

39. While Ms. Wester could be required to visit and treat patients in their homes, or supervise employees on field visits, most of her workday was spent behind a computer using software programs and communicating with other Well Care employees via email and phone.

40. Ms. Wester's job duties could be completed remotely.

41. During the relevant time period, Ms. Wester completed her job duties remotely.

42. Ms. Wester's Supervisor, Ms. Platte, who was employed in the role of Clinical Nurse Manger, shared duties with Ms. Wester and their tasks overlapped.

43. Ms. Platte completed her job duties remotely.

44. Well Care also permitted employees with job duties similar to Ms. Wester's to work remotely. Upon information and belief, these similarly situated employees were not pregnant or disabled.

45. Additionally, upon information and belief, as of the date of filing of this Complaint, Well Care has a policy requiring 100% of its administrative employees to work remotely for

6

the entire workday and these employees are satisfactorily completing their job duties.

**Ms. Wester's Pregnancy becomes known at the workplace (Fall 2018)**

46.    At the time she was hired in July 2018, Ms. Wester was approximately 7 weeks pregnant.

47.    By the beginning of October 2018, Ms. Wester had begun exhibiting physical signs of her pregnancy (i.e. "a baby bump") and several of her colleagues were aware of her pregnancy.

48.    Human Resource employees were also made aware of Ms. Wester's pregnancy in October.

49.    Then, in mid-October, Ms. Platte (Ms. Wester's supervisor) was observed exhibiting outward signs of frustration in the workplace relating to Ms. Wester and the fact of her pregnancy.

50.    Ms. Platte's behavior created tension, hostility, and turmoil in the workplace.

**Ms. Wester's Probationary Period Was Extended Because of Her Pregnancy**

51.    Ms. Wester, like other new hires at Well Care, had a 90-day probation period which would have ended on or around October 26, 2018.

52.    During the first 90 days of her employment, Ms. Wester was meeting Well Care's reasonable expectations in the performance of her job duties.

53.    However, she was never given the 90-day review by Ms. Platte (her supervisor) that normally accompanies the 90-day milestone.

54.    Days and weeks went on after the date Ms. Wester's 90-day probation period would have ended without Ms. Wester ever receiving her 90-day probation period review.

55.    Still having not received her 90-day review, on or around November 16, 2018, Ms. Wester contacted Well Care's Human Resources (HR) department and inquired about the

process of submitting a formal complaint to address her concerns, which involved Ms. Platte.

56. Ms. Wester was discouraged from utilizing Well Care's complaint process and was told to wait until someone in HR got back in touch with her.

57. HR never got back with Ms. Wester about the process for filing an internal complaint.

58. Rather, a meeting was scheduled with Brian Merck, Director of Operations, and Ms. Platte on or around November 19, 2018.

59. At this meeting, Ms. Wester was presented two options: (1) resign that day; or (2) extend her 90-day probation period another 30 days.

60. Plaintiff chose the second option in order to remain employed.

61. Prior to the November 19 meeting, Ms. Wester had not received any formal write-ups for performance issues.

62. In the weeks that followed the November 19, 2018 meeting, Ms. Wester continued meeting Well Care's reasonable expectations in the performance of her job duties.

**Ms. Wester's High-Risk Pregnancy (Pre-eclampsia) and Hospitalization (December 2018)**

63. On December 18, 2018, Ms. Wester went into pre-term labor at the Well Care office. This medical event required emergency care and treatment.

64. Ms. Wester was discharged later that day and was subsequently diagnosed with "Pre-eclampsia."

65. Pre-eclampsia is a pregnancy complication characterized by high blood pressure that can be fatal for both mother and child. This complication of pregnancy remains a leading cause of maternal morbidity and mortality.

**Well Care's Failure to Engage in an Interactive Dialogue and Provide Reasonable Accommodation**

66. After Ms. Wester's discharge from the REX OB Emergency Department on December 18, 2018, she was given a medical note. ("December 18 Note")

67. The note stated that Ms. Wester "may return to work after follow up visit this week."

68. Ms. Wester gave the December 18 Note to Well Care.

69. Shortly thereafter, Ms. Wester was cleared for "remote work" on December 19, 2018.

70. For the next few days, Ms. Wester worked remotely between December 19, 2018 and her follow up visit on December 21, 2018.

71. On December 21, 2018, Ms. Wester had her first follow-up visit and she was given a doctor's note ("December 21 Note").

72. Ms. Wester gave this note to her supervisor Amelia Platte at or around 1:00 p.m. on December 21.

73. After Ms. Wester provided the December 21 note to Ms. Platte, no one from Well Care asked Ms. Wester any questions about the note or her disability.

74. Then, less than 1 hour after Ms. Wester gave the note to Ms. Platte, at around 1:50 p.m., Ms. Platte emailed Ms. Wester the following:

    a. *"Bonita…Per your MD note, it states you can not return to work until after your follow up MD appointment on 12/27/18. Therefore, from now until your follow-up next week, you will not be able to work remotely either as MD states, No work until follow up on 12/27/18. You currently have 7 hours of PTO that you may use"*

75. The text of the December 21, 2018 note did not contain any specific recommendation or limitation against working remotely.

76. Ms. Platte's one-way email was a blatant attempt to dissuade Ms. Wester from requesting a reasonable accommodation, such as working remotely (which she was already doing).

9

77. The next email Ms. Wester received regarding her employment at Well Care was a mass email sent out minutes later by Ms. Platte at 2:15 p.m. on 12/21/18 which stated:

    a. *"Bonita will be out of the office for the foreseeable future. Please direct your further inquiries to myself"*

78. From Ms. Wester's perspective, based on the swift timing and tone of finality present in these emails, her requests for reasonable accommodation under the Americans with Disabilities Act were going to be resolved through an *ad hoc* process managed by a supervisor who had already expressed discriminatory animus toward her.

79. The ADA imposes on employers a good-faith duty to engage with their employees in an interactive process to identify a reasonable accommodation.

80. Although no formal process is required under the ADA, employers must have some process in place to prevent the mishandling[1] of a legitimate inquiry raised by an employee regarding their need for an accommodation due to a disability.

81. In light of the number of employees employed by Well Care (> 800 people), and the line of business Well Care is engaged in (medical care), the company's apparent process for addressing disability accommodations creates a substantial risk that employee rights under the ADA and its implementing regulations will be ignored and violated.

82. After receiving the 1:50 p.m. and 2:15 p.m. emails from Ms. Platte, at 2:22 p.m., Ms. Wester followed with Lydia Aldana, Well Care's Human Resources' Coordinator, by emailing her to inquire about working remotely. Specifically, Ms. Wester wrote:

    a. *Hi Lydia, I need some clarification. The MD note doesn't say I can't work remote.*

---

[1] A mishandled reasonable accommodation request includes one where the improper influence of supervisor bias towards a particular employee stymies the "interactive process" required by the ADA.

83. By sending this email, Ms. Wester was engaging with her employer regarding her need for an accommodation.

84. However, Well Care did not engage in return, and upon information and belief, no one from Well Care ever directly responded to Ms. Wester's email requesting clarification regarding her ability to work remotely until her follow up appointment (which was less than one week away).

85. Well Care's failure to respond to Ms. Wester's request to work remotely was another instance where Defendants did not make a good faith effort to assist Ms. Wester regarding her need for an accommodation and likewise fell short of their legal duty as an employer to engage in the interactive process required by the ADA.

86. Based these circumstances, a reasonable person in Plaintiff's situation would have concluded that Well Care was not going to let Ms. Wester work remotely. Thus, any attempt by Ms. Wester to further engage with Ms. Platte or anyone from HR on the issue would be futile, at least until the December 27 follow-up visit.

87. On December 27, 2018, Ms. Wester had her next follow-up visit and her providers gave her a note specifically recommending that she could work remotely for the remaining weeks of her pregnancy.[2] ("December 27 note")

88. Ms. Wester provided this note to the appropriate people at Well Care at around 4:20 p.m. on December 27, 2018.

89. Less than three hours after Ms. Wester provided the December 27 note, at 6:42 p.m., Ms. Platte wrote Ms. Wester an email which denied Ms. Wester's request for accommodation.

   a.    *"Bonita, Per HR we can not authorize you working remotely. It is a maximum of*

---

[2] Ms. Wester gave birth to her baby on January 24, 2019.

11

> *2 hours and it is at the discretion of management. You have exhausted your*
>
> *PTO."*

90.    Since she was informed that she had "exhausted" her PTO, was not approved to work remotely, and was not offered any other option, a reasonable person in Ms. Wester's position would have concluded that Well Care was not going to provide a reasonable accommodation that would allow her to continue working.

91.    Well Care's refusal to permit Ms. Wester to work remotely for the coming weeks was unreasonable as she had successfully worked remotely in the past without coming into the office.

92.    Well Care's refusal to permit Ms. Wester to work remotely for the coming weeks was unreasonable as other employees with the same or similar job duties as Ms. Wester had worked remotely without issue.

93.    Well Care's refusal to permit Ms. Wester to work remotely was unreasonable as 100% of Well Care's administrative employees are currently working remotely for the entire workday and are successfully completing their assignments.

94.    Additionally, Well Care's failure to engage with Ms. Wester regarding unpaid leave as a potential accommodation for the remainder of her pregnancy was a breach of its duty as an employer to engage in good-faith with Ms. Wester in an interactive process to identify a reasonable accommodation.

95.    Based on all of the communications from Well Care to Ms. Wester, along with the surrounding circumstances, a reasonable person in Ms. Wester's situation would have concluded that any attempt to engage with anyone at Well Care regarding any accommodation after these emails would have been futile and that she was going to be

terminated (e.g. "*Bonita will be out of the office for the foreseeable future*," "*Bonita, . . . we can not authorize you working remotely. . . Bonita…You have exhausted your PTO.*").

**Well Care's Purported "2-hour" Work from Home Policy for the CCC Position**

96.  Ms. Platte's December 27, 2018 email informed Ms. Wester that the Clinical Care Coordinator position was limited to 2 hours per day of remote work (hereafter, the "2-hour policy"). In other words, strictly applying the policy, if a Clinical Care Coordinator chose to work from home, to comply with the "2-hour policy," the employee would be required to come into the office for a minimum of six hours per day, assuming an 8 hour work day.

97.  When Ms. Wester emailed Lydia Aldana about working remotely on December 21, 2018, Ms. Wester was not told about the 2-hour policy as being a possible limitation on her ability to work remotely, even though Defendants would have been aware of such a policy at that time.

98.  The 2-hour policy was not incorporated into the written job specifications for the Clinical Care Coordinator position presented to Ms. Wester when she was hired.

99.  On those days when Ms. Wester had worked remotely prior to December 27, 2018, no one from Well Care required her to come into the office to comply with a "2-hour policy."

100.  Upon information and belief, during Ms. Wester's employment, other Clinical Care Coordinators employed by Well Care had been allowed to work remotely without having to comply with a "2-hour policy."

101.   Upon information and belief, during the time Ms. Wester was employed by Well Care, other similarly situated employees had been granted permission to work remotely as an

13

accommodation for their unique needs without having to present themselves in a physical office location for some set period of time each day.

**Well Care Terminated Ms. Wester due to her disability (January 2019)**

102. On January 3, 2019, Well Care sent Ms. Wester an email terminating her and citing the 2-hour policy. The letter attached to the email stated the following:

    a. *"Your position does not allow work from home for more than 2 hours per day; unfortunately, due to the continued medical restrictions that have been set, the requirements of the Clinical Care Coordinator role cannot be performed."*

103. The stated reasons for Plaintiff's discharge in the January 3, 2019 letter did not cite performance issues.

104. Well Care employees could perform the essential functions of the Clinical Care Coordinator position without coming into the office each day.

105. Well Care employees did perform the essential functions of the Clinical Care Coordinator position without coming into the office each day.

106. Ms. Wester could have performed the essential functions of the Clinical Care Coordinator position working remotely.

107. Allowing Ms. Wester to work remotely for the remainder of her pregnancy would not have imposed significant difficulty or expense upon Well Care.

108. Allowing Ms. Wester take unpaid leave for the remainder of her pregnancy would not have imposed significant difficulty or expense upon Well Care.

109. Ms. Wester gave birth to her baby on January 24, 2019, three weeks after she was terminated by Defendants.

14

## COUNT I – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

110.   Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

111.   Plaintiff was disabled within the meaning of the ADA because her pre-eclampsia substantially limited one or more "major life activities" and it impaired a "major bodily function" (the operation of her circulatory and reproductive systems).

112.   Defendants had notice of Plaintiff's disability.

113.   Plaintiff was a qualified individual that could have performed the essential functions of the Clinical Care Coordinator position with reasonable accommodation.

114.   Upon information and belief, Well Care never conducted an individualized assessment based on a company policy for evaluating an employee's disability and need for a reasonable accommodation, even though Defendants were aware of Plaintiff's condition and her need for accommodation.

115.   Indeed, on December 21, 2018, shortly after Plaintiff submitted her doctor's note, Plaintiff's supervisor Ms. Platte attempted to cut-off further attempt by Plaintiff to engage with anyone else at Well Care regarding an accommodation by sending out a mass email which stated: *"Bonita will be out of the office for the foreseeable future."*

116.   And on December 27, 2018, at 6:42 p.m., less than three hours after Plaintiff presented her December 27, 2018 note, she was simply informed that her request to work remotely was denied and that she had exhausted her PTO.

117.   Defendants failed to meet their good faith legal duty to engage with Ms. Wester to identify any reasonable accommodation that would have permitted Plaintiff to perform her essential job duties.

118.   Additionally, when Defendants denied Plaintiff's request for accommodation and

subsequently gave her official notice of termination, they claimed that Plaintiff's position was subject to a "2-hour policy" which limited the total number of daily hours she could work remotely.

119. However, the 2-hour policy cited by Defendants in the December 27, 2018 and January 3, 2019 emails to Ms. Wester is arbitrary and it was selectively and inflexibly applied to Ms. Wester.

120. Other Well Care employees who were not disabled were permitted to work remotely without being subject to the 2-hour policy or any similar policy.

121. Defendants could have allowed Plaintiff to work remotely for the remainder of her pregnancy without significant difficulty or expense.

122. Defendants also could have also allowed Plaintiff to take unpaid leave for the remainder of her pregnancy without significant difficulty or expense.

123. Defendants could have also provided some other form of reasonable accommodation without significant difficulty or expense.

124. However, rather than engage with Plaintiff to identify a suitable accommodation, Defendants terminated Plaintiff as a result of "medical restrictions" (e.g. "*due to the continued medical restrictions that have been set, the requirements of the Clinical Care Coordinator role cannot be performed.*").

125. Defendants' willful refusal to engage in the interactive process and ultimate failure to offer and provide Plaintiff a reasonable accommodation for her disability amounted to employment discrimination in violation of the ADA.

126. The unlawful employment practices complained of above were intentional.

127. The unlawful employment practices complained of above were taken by or sanctioned by

Ms. Wester's direct supervisor and members of Well Care's management team.

128. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ms. Wester.

## **COUNT II - SECTION 504 OF THE REHABILITATION ACT OF 1973**

129. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

130. Defendants are each a covered employer under Section 504 of the Rehabilitation Act of 1973 because they receive federal financial assistance.

131. Pursuant to implementing regulations for Section 504, including 29 CFR 32.1-51, covered entities may not discriminate against qualified individuals with disabilities in any of their employment and personnel practices, including demotion or termination, job assignments, leaves of absence, fringe benefits and all other terms, conditions and privileges of employment.

132. Under Section 504, covered entities must provide reasonable accommodations that enable qualified employees with disabilities to perform essential job functions and receive benefits and privileges equal to those employees without disabilities.

133. As previously alleged, Defendants failed to provide Plaintiff an accommodation under the ADA when such accommodation would not have imposed an undue hardship.

134. Defendants provided accommodations and benefits to other employees that, had they been offered to Ms. Wester, would have allowed Ms. Wester to perform her essential job functions for the remaining three weeks of her pregnancy (and related pre-eclampsia) and allowed her to keep her job until she gave birth.

135. Pursuant to 29 U.S.C. § 791 (f), based on the same conduct giving rise to Defendants' liability under the ADA as alleged in Count I, Defendants have also violated Section 504

17

of the Rehabilitation Act of 1973, and Plaintiff is entitled to all remedies and attorney fees permitted by 29 U.S.C. § 794a.

## COUNT III – SEX DISCRIMINATION: PREGNANCY DISCRIMINATION ACT
### (Well Care's Selective Application and Enforcement of Remote Work Policies)

136.  Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

137.  Plaintiff realleges that on December 27, 2018, Ms. Platte sent Ms. Wester an email denying her request for accommodation and referencing a 2-hour policy, which stated the following:

     a.  *"Bonita, Per HR we can not authorize you working remotely. It is a maximum of 2 hours and it is at the discretion of management. You have exhausted your PTO."*

138.  Plaintiff realleges that on January 3, 2019, Well Care sent Ms. Wester an email and letter officially terminating her and referencing a 2-hour policy, which stated the following:

     a.  *"Your position does not allow work from home for more than 2 hours per day; unfortunately, due to the continued medical restrictions that have been set, the requirements of the Clinical Care Coordinator role cannot be performed."*

139.  Upon information and belief, Well Care's "2-hour policy" which purportedly applied to the Clinical Care Coordinator position, was not exclusively limited to Clinical Care Coordinators.

140.  Upon information and belief, there are other positions at Well Care which may be subject to a policy which limits the number of daily hours worked remotely, such as the 2-hour policy.

141.  Well Care allowed other employees similarly situated to Plaintiff to work remotely, including temporarily and/or permanently disabled employees, employees with

18

permanent or temporary physical or medical limitations, or other employees where remote work was a benefit of employment and/or an accommodation that helped them do their job.

142. Well Care has also allowed its employees to work remotely for entire workdays without having to come into the office, even when those employees' positions were subject to an official policy limiting remote work, such as the 2-hour policy applied to Ms. Wester.

143. Upon information and belief, in addition to remote work, Defendants have also allowed other employees to take unpaid leave as an accommodation to a disability or some other circumstance which affected the employee's ability to work temporarily.

144. Well Care's decision to allow employees to work remotely or take unpaid leave was a "benefit" of employment the company provided.

145. However, Well Care did not uniformly and consistently apply its policies regarding remote work and unpaid leave.

146. Specifically, Defendants' enforcement of the 2-hour policy for remote work was selectively applied and enforced against Ms. Wester to provide a basis to deny her accommodation request on December 27, 2018 and officially terminate her the next week.

147. Plaintiff alleges that she was a member of a protected class qualified for the position that suffered an adverse employment action as a result of being denied an accommodation for her pregnancy-related disability that was provided to other non-pregnant workers similar in their ability or inability to work.

148. Plaintiff further alleges that Defendants did not have sufficient justification to refuse to permit Ms. Wester to work remotely for the remainder of her pregnancy when, *inter alia*,

19

they allowed other employees to work remotely for days and weeks at a time without being strictly subject to a 2-hour policy.

149. Defendants' treatment of Plaintiff thus amounted to discrimination in violation of Title VII and the PDA.

150. The unlawful employment practices complained of above were intentional.

151. The unlawful employment practices complained of above were taken by or sanctioned by Ms. Wester's direct supervisor and members of Well Care's management team.

152. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ms. Wester.

## COUNT IV – SEX DISCRIMINATION: PREGNANCY DISCRIMINATION ACT
### (Well Care's Extension of Ms. Wester's Probationary Period After Learning of Her Pregnancy)

153. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

154. By October 2018, Plaintiff's co-workers were aware of her pregnancy.

155. Plaintiff realleges that Amelia Platte, Plaintiff's supervisor, was also aware of Plaintiff's pregnancy by this time and was observed frustrated in the workplace after learning of Plaintiff's pregnancy.

156. At the end of a new-hire's 90-day employee evaluation, a Well Care employee can be transitioned from "probationary" employment status to "regular" employment status.

157. Plaintiff's 90-day evaluation period would have ended on or around October 26, 2018.

158. However, Plaintiff did not receive her 90-day evaluation on this date, nor did she receive it for the following three weeks. Thus, she remained in "probationary" employment status.

159. Upon information and belief, a Well Care employee with "regular" employment status is

20

eligible for additional benefits and/or accommodations that an employee with "probationary" employment status is not considered eligible for.

160. Plaintiff did not receive her "90-day" evaluation until November 20, 2018, almost 4 weeks after she reached her 90-day milestone and well after her pregnancy became known in the workplace.

161. Plaintiff realleges that on or around November 19, 2018, Well Care and Plaintiff had a meeting where Plaintiff was presented with two choices: (1) resign that day; or (2) agree to extend her probationary period for an additional 30 days.

162. On November 20, 2018, Plaintiff received a written document titled "Employment Certification – Probationary Period" which extended her probationary period to December 20, 2018 and set the date for her next evaluation on the same day.

163. The written assessment provided to Plaintiff at the November evaluation was the first time an issue regarding her work performance had been formally raised in writing in her nearly four months of employment.

164. When December 20, 2018 arrived, Plaintiff (who had recently gone into pre-term labor at the office) was again not timely given her evaluation. As she was not given an evaluation prior to her termination, she was terminated while still in probationary status.

165. Other similarly situated employees were given their 90-evaluation at or near the 90-day employment milestone.

166. Plaintiff's probationary period was extended after Well Care knew of her pregnancy.

167. Well Care's extension of Ms. Wester's probationary period was an adverse employment action taken because of her pregnancy

168. Plaintiff was terminated during her probationary period because Well Care refused to

accommodate a pregnancy-related medical limitation.

169. The unlawful employment practices complained of above were intentional.

170. The unlawful employment practices complained of above were taken by or sanctioned by Ms. Wester's direct supervisor and members of Well Care's management team.

171. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ms. Wester

**WHEREFORE**, Plaintiff prays for judgment and the following relief against Defendants:

A. Enter an order declaring that Defendants violated the ADA by failing to provide Plaintiff with Reasonable Accommodation as alleged in Count I.

B. Enter an order declaring that Defendants violated Section 504 of the Rehabilitation Act by failing to provide Plaintiff with Reasonable Accommodation as alleged in Count II.

C. Enter an order declaring that Defendants were in violation of Title VII, as alleged in Count III.

D. Enter an order declaring that Defendants were in violation of Title VII, as alleged in Count IV.

E. Grant a permanent injunction enjoining Defendants from engaging in any employment practice that discriminates on the basis of disability or pregnancy;

F. Order Defendants to make Plaintiff whole by providing appropriate back pay with prejudgment interest, in amounts to be proved at trial, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices pursuant to Counts I-IV, or any of them;

G. Order Defendants to make Plaintiff whole by providing compensation for past pecuniary losses including, but not limited to front pay, back pay, and consequential damages pursuant to Counts I-IV in amounts to be determined at trial;

H. Order Defendants to make Plaintiff whole by providing compensation for past and future non-pecuniary losses pursuant to Counts I-IV including, but not limited to, emotional pain, humiliation, and inconvenience, in amounts to be determined at trial;

I. Order Defendants to pay Plaintiff punitive damages to for their malicious and reckless conduct pursuant to Counts I-IV in an amount to be determined at trial;

22

J.   Award Plaintiff its costs and reasonable attorney's fees in this action;

K.  Grant such further relief as the Court deems necessary and proper.

This the 5th day of June 2020.

**MAGINNIS LAW, PLLC**
*Counsel for Plaintiff*

BY: <u>/s/ *Garrett L. Davis*</u>
EDWARD H. MAGINNIS
N.C. State Bar No. 39317
ASA C. EDWARDS IV
N.C. State Bar No. 46000
GARRETT L. DAVIS
N.C. State Bar No. 52605
4801 Glenwood Avenue, Suite 310
Raleigh, North Carolina 27612
Telephone: 919.526.0450
Fax: 919.882.8763
<u>emaginnis@maginnislaw.com</u>
<u>aedwards@maginnislaw.com</u>
<u>gdavis@maginnislaw.com</u>